RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 26a0189p.06

# UNITED STATES COURT OF APPEALS

FOR THE SIXTH CIRCUIT

───────────────

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

BERNARD W. SHELTON,

*Defendant-Appellant.*

Nos. 24-1846/1971

───────────────

Appeal from the United States District Court for the Eastern District of Michigan at Detroit.
No. 2:17-cr-20701-1—Denise Page Hood, District Judge.

Argued: February 5, 2026

Decided and Filed: July 1, 2026

Before: DAVIS, RITZ, and HERMANDORFER, Circuit Judges.

───────────────

**COUNSEL**

───────────────

**ARGUED:** George B. Donnini, BUTZEL LONG, P.C., Troy, Michigan, for Appellant. Wayne F. Pratt, UNITED STATES ATTORNEY'S OFFICE, Detroit, Michigan, for Appellee. **ON BRIEF:** George B. Donnini, Joseph E. Richotte, BUTZEL LONG, P.C., Troy, Michigan, for Appellant. Wayne F. Pratt, UNITED STATES ATTORNEY'S OFFICE, Detroit, Michigan, for Appellee.

───────────────

**OPINION**

───────────────

DAVIS, Circuit Judge. A jury convicted Michigan physician Bernard Shelton on twenty-one counts of unlawfully distributing controlled substances to his patients. The evidence presented at trial established that over the course of several years, Shelton prescribed medications to an assortment of patients, some of whom he did not examine and all of whom

presented with various indicators for illicit drug-seeking rather than medical treatment. Shelton's prescribing practices led to at least one death. So he received an enhancement for the count involving that patient. On appeal, Shelton challenges the sufficiency of the evidence against him as well as the authority of the Attorney General of the United States to regulate drug dispensing. And relatedly, because the district court's jury instruction on the required state of mind relied in part on the regulatory standard, Shelton challenges the instruction. He also argues that the district court's mask mandate for testifying witnesses violated the Confrontation Clause. We conclude that ample evidence supports his conviction; the jury instructions were not confusing, misleading, or otherwise infirm; and the mask mandate was not reversible error. So we AFFIRM.

## I.

### A.     *Factual Background*

Shelton practiced medicine as a solo practitioner at his medical clinic in St. Clair Shores, Michigan. As an internist, Shelton was authorized by the Drug Enforcement Administration ("DEA") to prescribe controlled substances. And during the time relevant to his convictions, Shelton derived over 90% of his Medicare income and close to 100% of his Medicaid income from patients prescribed controlled substances.

Over time, patients learned that they could "get a script pretty easily" from Shelton. (Jury Tr. Trans., R. 163, PageID 2410). Indeed, for years, Shelton prescribed, on average, over 150,000 dosage units of controlled substances per month. In late September 2015, two DEA agents visited Shelton to ask about his general practices and one of his patients (who, unbeknownst to Shelton, was an undercover investigator). That visit triggered a change. In the month before the DEA's visit, Shelton had prescribed over 120,000 dosage units. But after the visit, he wrote on average about 74,000 units per month for the rest of 2015 and 2016. During that visit, Shelton acknowledged that he had been "prescribing quite a bit of controlled substances." (Shelton Interview, R. 285-11, PageID 7626). He said he had been "slowly weeding out" patients for the past two years. (*Id.*). Yet the prescriptions he wrote for seven

individuals between 2014 and 2016—James Howard, Dennis Hoey, Bonnie Eubanks, Amber Lang, George Regul, April Powell, and Ronald Hannaford—tell a different story.

That story centers on drug diversion, a process whereby legitimate pharmaceuticals are moved "into an illegitimate market." (Jury Tr. Trans., R. 170, PageID 2881). Two of the ways drug diversion can happen is by a patient "selling them on the street" or "taking them to feed an addiction." (*Id.*). Certain conduct, or "red flags," hint that a patient is diverting their prescription medication. (*Id.* at PageID 2886). One red flag is a "dirty MAPS." (*Id.*). The Michigan Automated Prescription System ("MAPS") compiles a list of controlled substances filled for a particular patient. A patient's MAPS data is considered "dirty" when the patient sees multiple doctors and fills various prescriptions for controlled substances at different pharmacies. Laymen call it "doctor shopping." (*Id.* at PageID 2887). It is also a red flag for a patient to ask for a specific drug by name, instead of waiting for the doctor to decide what to prescribe. Such conduct is particularly concerning when a patient asks for a "highly abused narcotic by name." (*Id.* at PageID 2886–87). Other red flags include doctors writing prescriptions for "highly abused" drug combinations like "a narcotic and a benzodiazepine" and failing to perform physical examinations. (*Id.* at PageID 2886). Falsified records are also a major concern; accurately capturing each visit is critical for patient care and reminds doctors "about what's going on and what to look for and what may come next." (Jury Tr. Trans., R. 171, PageID 3134–35). Patients having an address outside the nearby area is another potential red flag, as is a patient obtaining prescription medications from a source other than their prescribing doctor. Likewise, a failed urine test raises concern. A failed test occurs when a patient tests negative for drugs the doctor has prescribed, and the negative screen can mean that the patient was selling rather than taking their prescription medication, or the patient was taking it too quickly (a sign of drug abuse).

Shelton's prescription practices raised one red flag after another. To start, he often prescribed drugs to patients with signs of doctor shopping. For instance, Howard's MAPS report showed that he had visited five other doctors for controlled substance prescriptions, excluding Shelton. Lang's records showed a similar pattern; she visited nine other doctors before she started seeing Shelton. In 2013 and 2014, Lang was still receiving controlled-substance

prescriptions from at least two other doctors while also receiving them from Shelton. Shelton appreciated the danger of prescribing to doctor-shoppers, claiming that his office did not "take those patients" and "reject[ed] [them] immediately." (Shelton Interview, R. 285-11, PageID 7619). Yet, despite that declaration, Shelton took on apparent doctor-shoppers Howard and Lang as patients.

Shelton also prescribed controlled substances to patients who asked for specific drugs by name. Take Howard. When he visited Shelton, Shelton asked what he could prescribe Howard to "help [him] out," and Howard asked for Xanax and Norco. (Partial Trans., R. 285-2, PageID 7570). Shelton obliged. Proceeding in this fashion prevents the doctor from deciding the best course of treatment for the patient. Shelton also repeatedly issued prescriptions for medications that were highly abused or, when combined, could have deadly consequences. For instance, Shelton prescribed "patient after patient" the "holy trinity"—a cocktail comprised of an opioid, a benzodiazepine, and a sedative that, according to the government's medical expert, Dr. Daniel Berland, is "never appropriate." (Jury Tr. Trans., R. 171, PageID 3128, 3131). Shelton prescribed this combination to Lang, Powell, and Hannaford. And he prescribed other patients, including Eubanks, dangerous combinations like Xanax and an opioid that can cause "respiratory suppression" and "[d]eath by asphyxiation." (*Id.* at PageID 3127). Indeed, in January 2016, Hoey overdosed and died from oxycodone prescribed by Shelton.

Shelton also prescribed medications to patients with known substance abuse issues or failed drug screens. For instance, Shelton knew that Howard drank alcohol while taking Xanax; Powell frequently used cocaine; and Regul had overdosed on heroin. Yet he continued writing them prescriptions for controlled substances. He did the same for patients like Howard, Hoey, Eubanks, Lang, and Regul, even though they repeatedly failed their drug screens or never tested in the first place. Shelton also issued prescriptions without physically examining patients. Physical exams are part of a "complicated process" that includes taking an "extensive" patient history to help doctors determine the best course of treatment for a patient. (*Id.* at PageID 3062). Though Shelton charted physical examinations for patients and confirmed to the DEA that he performed them, trial testimony showed otherwise. Howard, for instance, denied that anyone ever physically examined him. On one occasion, Howard visited Shelton's office and spent

nearly two hours there.  But Shelton met with Howard for only four minutes, and he spent "less than a minute" talking about Howard's health.  (Jury Tr. Trans., R. 159, PageID 2205; *see* Partial Trans., R. 285-5, PageID 7585–87).  Howard's testimony led Dr. Berland to opine that Shelton had falsified his records.

Shelton also prescribed to patients whose addresses were not in the area or who were obtaining medication from other, non-medical sources.  Indeed, Howard's address was over 20 miles from Shelton's office.  And Howard told a nurse that he had run out of medication and had to "get them from [his] neighbor."  (Partial Trans., R. 285-7, PageID 7596).  Likewise, evidence indicated that Lang engaged in similar behavior.  Despite the fact that such conduct violated Lang's "Narcotic Contract" with Shelton, Shelton kept her on as a patient.  Regul, too, resorted to buying "narcotics off the street" when he ran out.  (Jury Tr. Trans., R. 159, PageID 2260).  Dr. Berland testified that Shelton's prescribing practices for each of the seven patients here were inappropriate, dangerous, and often illogical, leading him to conclude that they were illegitimate and outside the usual course of professional practice.

### B.        Procedural Background

At trial, Shelton faced twenty-one counts of unlawful distribution of controlled substances, in violation of the Controlled Substances Act ("CSA"), 21 U.S.C. § 841(a)(1), including an enhancement in Count 7 under 21 U.S.C. § 841(b)(1)(C) for Hoey's January 2016 death.

Shelton's first trial, in July 2019, ended in a mistrial.  The government began a retrial in March 2020 but was thwarted by the exigent circumstances created by the COVID-19 pandemic.  The district court adjourned the trial pursuant to an administrative order addressing court operations and declared a second mistrial.

With the pandemic waning, Shelton's third trial began in March 2023.  A month earlier, the Chief Judge of the Eastern District of Michigan had rescinded a previously imposed mask mandate.  But the recission order still gave each district judge "the right to direct those in the courtroom to wear masks."  Administrative Order — Courthouse Entry/Masking, E.D. Mich. No. 23-AO-005 (Feb. 2, 2023).  For Shelton's trial, the district court required each witness to wear a

mask over their nose and mouth while testifying.  After a 13-day trial that included testimony from numerous witnesses, the jury found Shelton guilty on all counts, including Count 7's charge that Hoey's death resulted from Shelton's unlawful distribution of oxycodone.

After trial, Shelton moved for a judgment of acquittal or for a new trial under Federal Rules of Criminal Procedure 29 and 33.  He raised arguments about the sufficiency of the evidence, instructional error, and a Confrontation Clause violation.  The district court denied the motion and later sentenced Shelton to the mandatory minimum of 20 years' imprisonment on Count 7 and concurrent sentences ranging from 60 to 121 months on the other counts.  Shelton timely appealed.

## II.

*Sufficiency of the Evidence.*  Shelton first argues that the government presented insufficient evidence for a jury to convict him of unlawfully distributing controlled substances.  As reflected in our factual recitation, however, the government presented ample evidence of Shelton's knowingly and intentionally unauthorized practices.  So we will not disturb the district court's judgment.

### A.     Standard of Review

We review *de novo* challenges to the sufficiency of the evidence.  *United States v. Siefert*, 161 F.4th 379, 389 (6th Cir. 2025).  We will affirm the district court's decision to uphold the verdict so long as "any rational trier of fact could have found the elements of the offense beyond a reasonable doubt." *Id.* (citation omitted).  A defendant's burden to show the opposite—that *no* rational juror could have found beyond a reasonable doubt—is a heavy lift, as we view "the evidence in the light most favorable to the government and draw all inferences in the government's favor." *Id.* (citation omitted).  And in "draw[ing] all inferences and resolv[ing] any credibility determinations in favor of preserving the jury's verdict," *id.*, we cannot "weigh the evidence presented, consider the credibility of witnesses, or substitute our judgment for that of the jury," *United States v. Jackson*, 470 F.3d 299, 309 (6th Cir. 2006) (citation omitted).  It is with these proscriptions in mind that we proceed to the merits.

B.       *Merits Challenge*

Section 841(a)(1) states, in relevant part: "Except as authorized . . . , it shall be unlawful for any person knowingly or intentionally . . . to . . . distribute . . . a controlled substance."  21 U.S.C. § 841(a)(1).  And to prove the death-results enhancement under § 841(b)(1)(C) for Hoey's death, the government had to show that (1) Shelton knowingly or intentionally distributed a controlled substance without authorization and (2) Hoey's use of the distributed substance resulted in his death.  *Burrage v. United States*, 571 U.S. 204, 210 (2014).  Shelton concedes the second requirement but challenges the first.  Specifically, Shelton insists that the government failed to prove that he distributed the charged substances without authorization.

In the context of licensed prescribers and dispensers like doctors and pharmacists, we have held that distributing controlled substances without authorization means issuing them "without a legitimate medical purpose and outside the usual course of medical practice."  *United States v. Getachew*, 157 F.4th 883, 887 (6th Cir. 2025) (first citing 21 U.S.C. § 822(b); and then citing 21 C.F.R. § 1306.04(a)).  It is not enough, though, to show that the conduct was objectively unauthorized; the government also must prove that the prescribing doctor knew or intended his conduct to be unauthorized.  *Id.*  In deciding whether the government has met its burden, "[a] jury may rely on direct or circumstantial evidence to find that a defendant doctor knew a prescription lacked authorization."  *Id.* (citing *United States v. Bauer*, 82 F.4th 522, 529 (6th Cir. 2023)).  Section 1306.04(a) provides a framework for the government to prove that a doctor knew he lacked authorization through circumstantial evidence.  *Ruan v. United States*, 597 U.S. 450, 467 (2022).  "The regulation defining the scope of a doctor's prescribing authority does so by reference to objective criteria," like "legitimate medical purpose" and "usual course of professional practice."  *Id.* (citation modified); *see* 21 C.F.R. § 1306.04(a).  So the government's circumstantial evidence can include evidence that "a defendant's asserted beliefs or misunderstandings" are "unreasonable" as "measured against objective criteria."  *Ruan*, 597 U.S. at 467 (citation modified).

Here, the trial record contains abundant circumstantial evidence from which the jury could infer that Shelton knew his prescriptions were unauthorized.  *See Bauer*, 82 F.4th at 529. Dr. Berland repeatedly described Shelton's prescribing practices as lacking any legitimate

medical purpose and being outside the usual course of professional practice. Dr. Berland gave several reasons for his conclusion that "[m]edical practice wasn't occurring" at Shelton's office. (Jury Tr. Trans., R. 171, PageID 3177). He listed failing to conduct physical examinations, ignoring repeated negative drug tests and suspicious MAPS reports, prescribing to patients who ran out of drugs too fast, and writing prescriptions for potentially lethal drug cocktails for "patient after patient" as chief among them. (*Id.* at PageID 3131). From Dr. Berland's testimony, the jury could reasonably infer "that [these] repeated and brazen violations of medical norms don't happen by mistake." *Getachew*, 157 F.4th at 887.

Moreover, Dr. Berland's testimony does not stand alone. Other evidence also lends support to such an inference. Consider first Shelton's own statements to Howard during Howard's initial visit. Shortly after Shelton dictated into the patient record that Howard denied drinking, Howard clarified that he in fact drank "a little too much" on the weekend. (Partial Trans., R. 285-2, PageID 7571). But Shelton omitted Howard's drinking habit from his patient chart entirely. And rather than correcting his dictated notes, Shelton curiously paused to advise Howard that "in this business of what I do . . . I have to be very careful when patients come in here." (*Id.* at PageID 7572). He then explained that he "pay[s] attention to almost everything" because some patients who visit are actually "investigators" or "undercover cops" who would "jump on [him] for something" if he "miss[es] something." (*Id.*) From these statements and the discrepancy between Howard's patient chart and the recording of Howard's first visit, a jury could infer that Shelton understood he was issuing unauthorized prescriptions. *See United States v. Romano*, No. 24-3463, 2025 WL 2061204, at *4 (6th Cir. July 23, 2025) (considering defendant-doctor's testimony that "he recognized he 'might get in trouble' for his prescribing practices 'given the climate now'").

As discussed, each of the patients underlying Shelton's convictions presented to him with one drug diversion red flag or another. Lang and Howard had signs of doctor shopping and receiving the same or similar prescriptions that Shelton prescribed. Howard asked for drugs explicitly by name. And Howard, Hoey, Eubanks, and Regul all repeatedly tested negative for prescribed drugs—plus Lang never tested at all. Beyond these irregularities, Shelton also had received information that some of his patients (Eubanks, Regul, Hannaford, and Powell) may

have been using illegal drugs.  And there was more; Shelton prescribed to patients who (1) lived far outside the immediate area, (2) he had not physically examined, and (3) were obtaining their medication from other sources.  Courts have repeatedly acknowledged such practices as indicative of unauthorized distribution practices.  *See, e.g.*, *Bauer*, 82 F.4th at 529 (failure to "adequately examine the patients, establish diagnoses, consider red flags, or attempt more conservative treatment options"); *United States v. Stanton*, 103 F.4th 1204, 1210 (6th Cir. 2024) (identifying pill mill "red flags" such as: "long and unusual clinic hours; patients traveling long distances from out of state; high narcotics dosages without individualization or tapering; and continued prescriptions to patients who failed drug screens"); *United States v. Anderson*, 67 F.4th 755, 769 (6th Cir. 2023) (per curiam) (doctor ignoring obvious signs of addiction).

Ignoring all these signs, Shelton continued issuing prescriptions for each of the seven patients discussed.  As we recently explained, a defendant doctor's "failure to adequately examine his patients, establish diagnoses, consider red flags, or attempt more conservative treatment options, in violation of the standard of care espoused by the Government's medical practice expert," allows "a jury to infer the defendant's subjective knowledge and intent to issue unauthorized prescriptions."  *United States v. Sherman*, 168 F.4th 417, 425 (6th Cir. 2026) (citation modified).  So it was permissible for Shelton's jury to do so here.  Plus, the government presented evidence that Shelton falsified medical records and then lied about doing so to the DEA.  *Cf. United States v. Washington*, 715 F.3d 975, 980 (6th Cir. 2013) (rejecting insufficiency claim in fraud-conspiracy case where jury could infer knowledge and intent from evidence of "fabricated or at least inflated" invoices and collecting cases allowing the same).  And the government makes the compelling point that, viewed in the light most favorable to the government, the "dramatic reduction" in Shelton's prescriptions after the DEA's visit to his office is also circumstantial evidence that Shelton knew his prescriptions were unauthorized. (Appellee's Br., ECF 85, 38).  Considered in the aggregate, the government's evidence amply supports the jury's verdict on all twenty-one counts.

Resisting this conclusion, Shelton contends that given the various ailments reported by his patients, no reasonable jury could conclude that he issued them prescriptions for anything other than to treat their alleged conditions.  In advancing this argument, Shelton essentially asks

us to reweigh the evidence—something we are not permitted to do.  *See Getachew*, 157 F.4th at 888.  The jury was free to accept Shelton's version of the facts, but it did not.  And even absent direct evidence of Shelton's intent, "the compounding of [all the] circumstantial evidence 'especially as measured against objective criteria' allows an inference that [Shelton] had subjective knowledge." *Bauer*, 82 F.4th at 529 (quoting *Ruan*, 597 U.S. at 467).  Thus, the jury "could credit this evidence and find that [he] *knew* his prescriptions were without authorization, satisfying *Ruan*'s *mens rea* requirement." *Id.*  So when viewed in the light most favorable to the government, the evidence was sufficient to sustain the jury's verdict.

### C.          Regulatory Challenge

### 1.          Nondelegation Doctrine

Taking a different tack, Shelton faults the entire framework that has developed around determining whether certain prescribing practices are authorized.  In particular, Shelton argues that Congress has not delegated to the Attorney General of the United States the authority to define the scope of authorization under the CSA, and courts should decline to read in such a delegation under the major questions doctrine.  These arguments fail.

Because Shelton raised his arguments about the nondelegation and major questions doctrines for the first time in a post-trial motion, we review them only for plain error.  *See United States v. Margarita Garcia*, 906 F.3d 1255, 1268–69 (11th Cir. 2018) (reviewing for plain error where the defendant first raised a claim in her motion for a new trial); *United States v. Brandao*, 539 F.3d 44, 57 (1st Cir. 2008) (applying plain-error review to issue first raised "in a post-trial motion, which the district court denied").  Thus, for Shelton to prevail, the asserted "error in the district court must have been plain, affected the defendant's substantial rights, and seriously affected the fairness, integrity or public reputation of judicial proceedings." *United States v. Burrell*, 114 F.4th 537, 554 (6th Cir. 2024) (citation modified).  Shelton cannot satisfy the first prong.

Recall that under § 841(a)(1), the knowing and intentional distribution of a controlled substance is unlawful, "[e]xcept *as authorized*." 21 U.S.C. § 841(a)(1) (emphasis added). "[T]he scope of a doctor's prescribing authority" is defined by regulation, at 21 C.F.R.

§ 1306.04(a). *Ruan*, 597 U.S. at 467. And that regulation states: "A prescription for a controlled substance to be effective must be issued for a legitimate medical purpose by an individual practitioner acting in the usual course of his professional practice." 21 C.F.R. § 1306.04(a). So a "prescription for a controlled substance is authorized when it is made for a legitimate medical purpose in the usual course of professional practice." *United States v. Suetholz*, No. 23-5613, 2024 WL 4182903, at *3 (6th Cir. Sep. 13, 2024) (citation modified).

Article I, § 1 of the Constitution vests in Congress "[a]ll legislative Powers herein granted." U.S. Const. art. I, § 1. Under the nondelegation doctrine, by specifically designating Congress as the body vested with legislative authority, the Constitution necessarily restricts Congress from "delegat[ing] its legislative power to another branch of Government." *Touby v. United States*, 500 U.S. 160, 165 (1991). Even so, Congress may still "seek[] assistance, within proper limits, from its coordinate Branches." *Id.* (citing *Mistretta v. United States*, 488 U.S. 361, 372 (1989)). To enlist such assistance without offending the Constitution, Congress must include in the relevant statute "an intelligible principle to which the person or body authorized to exercise the delegated authority is directed to conform." *Mistretta*, 488 U.S. at 372 (citation modified).

According to Shelton, the Attorney General impermissibly exercised legislative authority by expanding doctors' criminal liability under the CSA. That is so, says Shelton, because 21 C.F.R. § 1306.04(a) rests the scope of a registered doctor's "authorization" on meeting an objective standard absent from the statute. But on plain-error review, Shelton's regulation-based argument gains him no traction. That is because caselaw interpreting the CSA reveals no "obvious or clear" conflict between the regulation and the CSA. *United States v. Tellez*, 86 F.4th 1148, 1154 (6th Cir. 2023) (citation modified). If anything, the Supreme Court's discussion of 21 C.F.R. § 1306.04(a)'s meaning in *Gonzales v. Oregon*, 546 U.S. 243 (2006), belies any daylight. Interpreting the same text that Shelton challenges, the Court determined that the regulation's effect is "merely to paraphrase the statutory language." *Id.* at 257. So the premise underlying Shelton's nondelegation point—that the Attorney General has improperly "narrowed" doctors' statutory authorization via regulation—conflicts with relevant caselaw.

We likewise see no apparent conflict between the regulation and the CSA, nor injection of ambiguity, as Shelton suggests. Quite the opposite—several provisions of the CSA demonstrate that the Attorney General borrowed from the statutory language in promulgating 21 C.F.R. § 1306.04. For example, in its congressional findings, Congress recognized that many controlled substances have a "useful and *legitimate medical purpose*" that furthers the health of the American people. 21 U.S.C. § 801(1) (emphasis added). Congress also defined medical "practitioner[s]" as those who are "registered" or "permitted" to prescribe controlled substances "in the course of professional practice." *Id.* at § 802(21); *see id.* at § 822(b) (authorizing those registered with the Attorney General to dispense controlled substances "to the extent authorized by their registration:"); *id.* at § 829(a), (b) (imposing general requirement that certain controlled substances be dispensed via prescription). And in multiple places in the CSA, Congress defined a "valid prescription" as "a prescription that is issued for a legitimate medical purpose in the usual course of professional practice." *Id.* at § 829(e)(2)(A); *see id.* at § 830(b)(3)(A)(ii) (containing similar language); *see also United States v. Moore*, 423 U.S. 122, 124 (1975) ("[R]egistered physicians can be prosecuted under [21 U.S.C. §] 841 when their activities fall outside the usual course of professional practice."). By hewing to the statutory terminology in constructing the regulation, the Attorney General promulgated § 1306.04 consistent with Congress's delegation.

Shelton also invites us to adopt a rule (based on Justice Alito's *Ruan* concurrence) that a doctor's "subjective purpose in issuing a given prescription" controls. (Appellant's Br., ECF 72, 20). But our task is simply to review for plain error. According to Shelton, if the doctor's subjective purpose is to "treat[] a patient," then, the doctor was "acting within the course of professional practice" and, thus, was "authorized to issue a prescription." (*Id.*). Under Shelton's theory, a prescription should be considered unauthorized for purposes of § 841(a)(1) only if the doctor prescribes a controlled substance for a "non-medical purpose," i.e., "for a reason other than the prevention, cure, or alleviation of a disease or injury." (*Id.* at 20, 27). At oral argument, Shelton intimated that reading unauthorized in this way would facilitate, or at least avoid thwarting, innovation and discovery in the use of drugs in non-conventional ways. Whatever appeal this approach may have, the *Ruan* majority rejected a similar interpretation of § 841(a), stating that "§ 841, like many criminal statutes, uses the familiar *mens rea* words 'knowingly or

intentionally,'" not words like "'good faith,' 'objectively,' 'reasonable,' or 'honest effort.'" *Ruan*, 597 U.S. at 465.  The *Ruan* majority read 21 C.F.R. § 1306.04, for its part, to reference "objective criteria."  *Id.* at 467; *see also United States v. Campbell*, 135 F.4th 376, 394 (6th Cir. 2025) ("The government can prove knowledge of a lack of authorization by reference to objective criteria." (citation modified)).  And we "may not overrule the handiwork of [our] superiors."  *United States v. Wandahsega*, 924 F.3d 868, 879 (6th Cir. 2019) (citation omitted). Nor may we conclude that the district court plainly erred in applying a definition of unauthorized that comports with binding authority of this circuit.  *Cf. United States v. Woodruff*, 735 F.3d 445, 451 (6th Cir. 2013) ("[The district court's] error was not plain, however, because the state of the law was both uncertain and not obvious at the time of its decision and at the time of appellate review.").

### 2. *Major Questions Doctrine*

Shelton also argues that the major questions doctrine counsels against reading an implicit delegation of authority into the CSA.  We reject that argument, too.

The major questions doctrine is limited to "extraordinary cases" where "the history and the breadth of the authority that the agency has asserted, and the economic and political significance of that assertion, provide a reason to hesitate before concluding that Congress meant to confer such authority."  *Allstates Refractory Contractors, LLC v. Su*, 79 F.4th 755, 767 n.3 (6th Cir. 2023) (citation modified); *see Gundy v. United States*, 588 U.S. 128, 167 (2019) (Gorsuch, J., dissenting) (describing instances when Supreme Court has applied the major questions doctrine).  "[I]t applies," we have explained, "when the question presented is 'whether Congress in fact meant to confer the power the agency has asserted.'"  *Allstates*, 79 F.4th at 767 n.3 (quoting *West Virginia v. EPA*, 597 U.S. 697, 721 (2022)).  In such cases, the agency "must point to 'clear congressional authorization' for the power it claims."  *West Virginia*, 597 U.S. at 723 (citation omitted).

Shelton says there is a major questions problem because "Congress has not spoken in a sufficiently clear manner to infer that it intended to delegate the power to generally limit doctors' prescription-writing authority" to the Attorney General.  (Appellant's Br., ECF 72, 24).  But

here, too, Shelton's premise is faulty.  As we explained, § 1306.04's objective standard does not conflict with the CSA (as interpreted by authoritative caselaw).  Nor does it impermissibly seek to "define the substantive standards of medical practice" at the state level.  *Gonzales*, 546 U.S. at 264.  It instead leaves the contours of this measure to traditional means of proof, including "expert testimony" on "the generally acceptable standards of medical practice for issuing prescriptions." *United States v. Kirk*, 584 F.2d 773, 785 (6th Cir. 1978); *see also United States v. Fletcher*, No. 25-5468, 2026 WL 822272, at *5 (6th Cir. Mar. 25, 2026).  That  reading is not "'transformative.'" *Learning Resources, Inc. v. Trump*, 607 U.S. 229, 244 (2026) (quoting *West Virginia*, 597 U.S. at 724).  Instead it aligns with the Supreme Court's prior discussions of the CSA's scope.  *See Ruan*, 597 U.S. at 466–67; *Gonzales*, 546 U.S. at 269–71; *Moore*, 423 U.S. at 140–42.

## III.

*Jury Instructions*.   Shelton's attack on the jury instructions parallels his sufficiency argument.  He argues that the district court was wrong to weave an objective standard into the definition of "authorization" and instruct the jury that it could convict him if he knowingly and intentionally deviated from that standard, even if he had a medical purpose in issuing the prescription.  Not so.

### A.     Preservation and Standard of Review

The parties dispute whether Shelton preserved his challenge to the jury instructions and thus whether abuse-of-discretion (preserved challenge) or plain-error review (unpreserved challenge) applies.  The government argues that Shelton did not raise this issue until his post-trial motion, so the claim should be reviewed for plain error.  But it also argues that Shelton's jury-instruction claim fails under any standard.  Because we agree that Shelton's claim fails under any applicable standard, we need not resolve, from this somewhat muddled record, whether Shelton's objections sufficed to preserve the issue.

We, therefore, review Shelton's objections to the jury instructions under the abuse-of-discretion standard and consider their "legal accuracy" *de novo*. *United States v. You*, 74 F.4th 378, 391 (6th Cir. 2023) (citation omitted).  In doing so, we "may only reverse a conviction on

these grounds if the instructions, viewed as a whole, were confusing, misleading, or prejudicial." *United States v. Betro*, 115 F.4th 429, 453 (6th Cir. 2024) (citation modified).

### B. District Court's Charge to the Jury

After explaining the parties' stipulation that Shelton was "authorized" by his DEA license to prescribe controlled substances, the district court expounded further that "[a] doctor is authorized to issue a prescription if he does so for a legitimate medical purpose in the usual course of professional service." (Jury Tr. Trans., R. 199, PageID 4047). It also instructed the jury that the government had to show that each "particular prescription was unauthorized," meaning that it was "not for a legitimate medical purpose in the course of professional practice." (*Id.* at PageID 4048). Regarding the proofs necessary to convict, the district court stated that the government needed to show beyond a reasonable doubt that Shelton "issued and transferred that particular prescription knowing or intending that it was unauthorized." (*Id.*). It then informed the jury that although proof that Shelton "acted without a legitimate medical purpose or outside the usual course of his professional practice" was "not enough," proof that he did so was "circumstantial evidence that may be used to prove knowledge of a lack of authorization." (*Id.*). As to the knowledge requirement, the district court advised jurors that the government had to "prove beyond a reasonable doubt that [Shelton] knew or intended that his conduct was unauthorized" on each count. (*Id.*). The court defined "knew" and "knowingly" by differentiating those terms from acts taken out of "ignorance, mistake or accident." (*Id.*). And the court advised the jury it was "not limited to evidence" related to particular prescriptions but could "consider all of the evidence in the case." (*Id.* at PageID 4048–49).

### 1. Definition of "Unauthorized"

*First*, Shelton quarrels with the district court's use of language from 21 C.F.R. § 1306.04(a) in defining "unauthorized" in objective terms. But the district court's instructions are compatible with *Ruan*. Indeed, in *Ruan* the Court confirmed that prosecutors "can prove knowledge of a lack of authorization through circumstantial evidence." 597 U.S. at 467. And it acknowledged that "the regulation defining the scope of a doctor's prescribing authority does so by reference to objective criteria" like "'legitimate medical purpose' and 'usual course' of

'professional practice.'" *Id.* (quoting 21 C.F.R. § 1306.04(a)). The Court reasoned that "the more unreasonable a defendant's asserted beliefs or misunderstandings are, *especially as measured against objective criteria*, the more likely the jury will find that the Government has carried its burden of proving knowledge." *Id.* (citation modified) (emphasis added). Thus, in this way, the *Ruan* Court was "careful not to bar all consideration of objective criteria." *Bauer*, 82 F.4th at 528; *see also Campbell*, 135 F.4th at 394 ("The government can prove knowledge of a lack of authorization by reference to objective criteria." (citation modified)). Because it is permissible for a jury to use objective criteria when considering whether a doctor was authorized to issue a prescription, the instructions complied with *Ruan*.

### 2. Scienter Requirement for Unauthorized Distribution

*Second*, Shelton argues that the jury instructions lacked an adequate explanation of the *scienter* element as it relates to unauthorized distribution. We disagree.

Under *Ruan*, the government must prove "that a defendant knew or intended that his or her conduct was unauthorized." *Ruan*, 597 U.S. at 467. We recently explained what this means for the authorization requirement: "*Ruan* clarified that once a defendant produces evidence that he falls within the authorization exception, the Government has the burden of proving lack of authorization—that a defendant knew or intended that his conduct was unauthorized—beyond a reasonable doubt." *Bauer*, 82 F.4th at 528.

The instructions adequately explained this requirement. Yes, *Ruan* mandates proof that a defendant "knowingly or intentionally acted in an unauthorized manner." 597 U.S. at 457, 468. But at three points, the district court's instructions covered this requirement. They required the jury to find that the government had proved beyond a reasonable doubt (1) that Shelton "issued and transferred [a] particular prescription *knowing or intending that it was unauthorized*" and (2) that he "*knew or intended that his conduct was unauthorized* with respect to [a] particular count"; and they (3) explained that the jury was not limited to evidence surrounding a particular prescription when "determining whether [Shelton] issued and transferred [that] particular prescription *knowing or intending that it was unauthorized*." (Jury Tr. Trans., R. 199, PageID 4048–49 (emphasis added)). So the instructions abide by *Ruan*.

This conclusion comports with recent decisions of this court. For example, in *United States v. Iwas*, No. 24-1234, 2025 WL 2955197, at \*4 (6th Cir. Oct. 20, 2025), a case involving a pharmacist instead of a physician, we reviewed an instruction similar to the one here. In upholding the instruction, *Iwas* cited *Anderson*, which held that instructions comport with *Ruan* when they "refer[] continuously to" a defendant's knowledge. *See Iwas*, 2025 WL 2955197, at \*5 (citing *Anderson*, 67 F.4th at 766). More recently, in *United States v. Herrell*, --- F.4th ----, ----, 2026 WL 1733601, at \*12 (6th Cir. June 16, 2026), we deemed the instructions there "acceptable" because they "expressed the holding of *Ruan* nearly verbatim." Those instructions, like the ones here, required the government to prove that "the defendants knew that their 'prescriptions were not issued for a legitimate medical purpose by a practitioner acting within the usual course of professional practice.'" *Id.* It is particularly important for instructions to "direct the jury's attention to [the defendant's] subjective mindset in issuing the prescriptions." *Anderson*, 67 F.4th at 766. And we have emphasized that "no lesser level of culpability" than knowledge "is required" to convict. *Id.* The district court complied with these principles. When it defined "knowingly," it "juxtaposed knowledge with lesser levels of culpability," *Bauer*, 82 F.4th at 532, describing it as a "state of mind" in which the defendant was "conscious and aware of his action, realized what he was doing or what was happening around him, and did not act or fail to act because of ignorance, mistake or accident," (Jury Tr. Trans., R. 199, PageID 4048). This stays true to binding precedent. So Shelton's challenges to the jury instructions fail.

**IV.**

*Confrontation Clause—Mask Mandate.* Last, Shelton argues that the district court's mask mandate violated his Sixth Amendment right to confront the witnesses against him face to face.

*A.      Standard of Review*

Both parties agree that Shelton's Sixth Amendment argument should be reviewed for plain error due to Shelton's failure to raise the issue below. And Shelton's claim fails plain-error review.

Again, the plain-error standard requires Shelton to show an error that was "plain, affected [his] substantial rights, and seriously affected the fairness, integrity or public reputation of judicial proceedings." *Burrell*, 114 F.4th at 554 (citation modified). And to have affected Shelton's substantial rights, the claimed error must have been "prejudicial, meaning that it affected the outcome of the proceedings below." *United States v. Hamm*, 400 F.3d 336, 339 (6th Cir. 2005). In other words, there must be "'a reasonable probability that, but for the error,' the outcome of the proceeding would have been different." *Bauer*, 82 F.4th at 530 (quoting *Molina-Martinez v. United States*, 578 U.S. 189, 194 (2016)).

### B.      Error

The Confrontation Clause of the Sixth Amendment states: "In all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him." U.S. Const. amend. VI. The Clause's "main and essential purpose" is to secure the defendant's "opportunity of cross-examination." *Delaware v. Van Arsdall*, 475 U.S. 673, 678 (1986) (citation modified). Thus, the "usual rule [is] that a defendant is entitled to meet his accusers 'face to face.'" *Pitts v. Mississippi*, 607 U.S. 1, 5 (2025) (first citing *Coy v. Iowa*, 487 U.S. 1012, 1016 (1988); and then citing *Maryland v. Craig*, 497 U.S. 836, 844 (1990)). But the right to face-to-face confrontation is not absolute. *Craig*, 497 U.S. at 850. And we are unaware of any binding precedent that has addressed whether requiring a witness to wear a mask that partially covers the face offends the "face-to-face" aspect of the right. The government urges us to adopt our sister circuit's approach in *United States v. Maynard*, where the Fourth Circuit opined that jurors can "assess credibility not only by facial expressions, but also by" a witness's words, manner of speaking, "body language," "pauses," and "other intangible factors" even with masked witnesses. 90 F.4th 706, 712 (4th Cir. 2024) (citation omitted); *see also United States v. Jenkins*, 128 F.4th 885, 891 (7th Cir. 2025) ("[T]he Confrontation Clause . . . must occasionally give way to considerations of public policy and . . . [t]he need to prevent the spread of COVID-19 was an important public policy goal that warranted the requirement of face masks in the courtroom." (citation modified)). Also, a court may deny face-to-face confrontation when doing so is "necessary to further an important public policy and only where the reliability of the testimony is otherwise assured." *Craig*, 497 U.S. at 850; *see also United States v. Graham*, No.

21-10277, 2024 WL 771698, at *1 (9th Cir. Feb. 26, 2024), *cert. denied*, 145 S. Ct. 254 (2024) (similar) ("Considering that the trial took place during the COVID-19 pandemic, the masking requirement was necessary to further an important state interest, namely, the health of trial participants." (citation modified)).  Even short of adopting *Maynard*'s full reasoning, the lack of binding authority on the question, coupled with Shelton's concession that there is no "Sixth Circuit case directly on point with the issue presented here," (Appellant's Br., ECF 72, 66), means that Shelton "cannot demonstrate an error that was obvious or clear," *United States v. Hills*, 27 F.4th 1155, 1174 (6th Cir. 2022) (citation modified).

Still, Shelton points to several district court decisions in which the courts prioritized allowing a full view of witnesses' faces—via use of clear face shields or permitting witnesses to lower their masks while they testified—in an apparent effort to facilitate assessment of the witnesses' demeanors.  *See United States v. Davis*, No. 18-cr-20085, 2021 WL 5989060, at *2 (E.D. Mich. Dec. 16, 2021); *United States v. Schwartz*, No. 19-cr-20451, 2021 WL 5283948, at *1–3 & n.2 (E.D. Mich. Nov. 12, 2021); *United States v. Robertson*, No. 17-cr-02949, 2020 WL 6701874, at *1–2 (D.N.M. Nov. 13, 2020).  But to show plain error, Shelton must identify on-point precedent from our court or the Supreme Court.  *See Tellez*, 86 F.4th at 1154.  Still, we acknowledge that the face-to-face requirement cannot "easily be dispensed with."  *Craig*, 497 U.S. at 850.  So when a court seeks to deviate from the "usual rule" of face-to-face confrontation, "generalized findings" will not suffice and the court must instead make "a case-specific finding of necessity."  *Pitts*, 607 U.S. at 2, 5 (citation modified).  *But see Crawford v. Washington*, 541 U.S. 36, 67–68 (2004) ("By replacing categorical constitutional guarantees with open-ended balancing tests, we do violence to [the Framers'] design.").

To be sure, the district court did not make any case-specific findings of necessity for the mask mandate here.  *Craig*, 497 U.S. at 850; *Pitts*, 607 U.S. at 2, 5.  The government says that because Shelton never objected to the masks, "the district court had no reason to make particular findings."  (Appellee's Br., ECF 85, 58).  Even if we assume that the district court abused its discretion in imposing the mandate, and that its failure to make any particularized findings ran afoul of *Craig* and *Pitts*, Shelton's claim fails on the prejudice prong.  *Cf. United States v. Smith*,

No. 21-5432, 2021 WL 5567267, at *2 (6th Cir. Nov. 29, 2021) (assuming without deciding that juror mask mandate was an abuse of discretion).

It was Shelton's burden to show that any error affected his substantial rights. And this, he has failed to do. In his opening brief, Shelton skips the prejudice prong and jumps straight to whether the mask mandate "undermined the fairness and integrity of his trial." (Appellant's Br., ECF 72, 70). But for us to reach that question, Shelton must first show that the district court's error affected his substantial rights, i.e., that there is a reasonable probability that, absent the error, the proceedings would have had a different outcome.

Shelton does not engage this inquiry. For instance, although he lists the witnesses who testified while masked, he points to no witness whose credibility he thinks was bolstered by the fact that the witness wore a mask. Nor does he identify a masked witness whose testimony, if disbelieved, might have changed the outcome. Indeed, Shelton includes no particularized discussion of the witnesses and has no general argument that there was a legitimate question of their credibility on any particular point.

Importantly, the district court placed each witness under oath, the defense cross-examined them, and the jury observed their demeanor. Everyone involved in the process—the judge, the jury, the defendant, counsel on both sides, and the witnesses—was present in the courtroom, making it "even more protective of the defendant's interests than was the case in *Craig*." *Maynard*, 90 F.4th at 712 (citation modified); *see Craig*, 497 U.S. at 841–42, 850–51 (approving procedure allowing child witnesses to testify via closed-circuit television, outside presence of jury, defendant, and judge, because witnesses were under oath, cross-examined, and jury could still observe the witnesses' demeanor).

So without a discussion of the mask mandate's effect on the credibility of specific witnesses, we cannot conclude that there was a "reasonable probability" that, but for the district court's failure to make case-specific findings about the mask mandate, Shelton's trial would have had a different outcome. *Bauer*, 82 F.4th at 530 (citation modified). Accordingly, Shelton's trial "preserved the Confrontation Clause's core principles—physical presence and the opportunity

for cross-examination"—and he has not satisfied the plain-error standard. *Maynard*, 90 F.4th at 712 (citing *Coy*, 487 U.S. at 1017–20).

Shelton argues that the court should presume that imposition of the mask mandate without case-specific findings affected his substantial rights because "the nature of the right" makes it "enormously difficult" to show prejudice, since it is "impossible to know how a jury might have assessed each witness's credibility." (Appellant's Reply Br., ECF 87, 36 (citation omitted)). This argument is without merit. As we explained above, it would not have been difficult for Shelton to point to some feature of some witness's testimony that was affected by the mask and that, without the mask, would have led to a different outcome. So his challenge to the mask mandate fails under plain-error review.

## V.

For the foregoing reasons, we AFFIRM.